# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 27, 2019      Decided November 8, 2019

No. 16-5287

SAVE JOBS USA,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
OFFICE OF GENERAL COUNSEL,
APPELLEE

ANUJKUMAR DHAMIJA, ET AL.,
INTERVENORS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00615)

———

*John M. Miano* argued the cause for appellant. With him on the briefs were *Dale Wilcox* and *Michael Hethmon*.

*Matthew J. Glover*, Attorney, U.S. Department of Justice, argued the cause for appellee. On the brief were *Glenn M. Girdharry*, Assistant Director, and *Joshua S. Press*, Trial Attorney. *Erez Reuveni*, Assistant Director, entered an appearance.

2

*Carl E. Goldfarb* argued the cause and filed the brief for intervenors.

*Paul W. Hughes*, *Michael B. Kimberly*, *Jason Oxman*, *Steven P. Lehotsky*, *Michael B. Schon*, and *Peter C. Tolsdorf* were on the brief for *amici curiae* The Chamber of Commerce of the United States, et al. in support of appellees.

Before: TATEL and GRIFFITH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Save Jobs USA, an association representing Southern California Edison workers, challenges a Department of Homeland Security rule that permits certain visa holders to seek lawful employment. The district court found that Save Jobs lacked Article III standing and granted summary judgment in the Department's favor. We reverse. For the reasons set forth in this opinion, we conclude that Save Jobs has demonstrated that the rule will subject its members to an actual or imminent increase in competition and that it therefore has standing to pursue its challenge.

**I.**

Our nation's immigration laws distinguish between two categories of foreign nationals seeking admission to the United States: "nonimmigrants," who plan to stay in the country only temporarily, and "immigrants," who plan to stay permanently. *See* 8 U.S.C. § 1184(b) ("Every alien . . . shall be presumed to be an immigrant until he establishes . . . that he is entitled to a nonimmigrant status . . . ."); *id.* § 1101(a)(15) (setting forth nonimmigrant classifications). The rule challenged here

3

attempts to ease the burdens faced by certain nonimmigrants during their often-lengthy transition to immigrant status.

The Immigration and Nationality Act authorizes the admission of nonimmigrants "to perform services . . . in a specialty occupation," *id.* § 1101(a)(15)(H)(i)(b), and those specialty workers' spouses, *id.* § 1101(a)(15)(H). Specialty workers admitted under this provision receive H–1B visas, which permit them to work in the occupation for which they were admitted. 8 C.F.R. § 214.2(h)(1)(i), (ii)(B). The specialty workers' spouses receive H–4 visas, which permit the spouses to reside in the United States but do not authorize them to work. *Id.* § 214.2(h)(9)(iv). Generally, H–1B visa holders and their H–4 spouses may reside in the country for a maximum of six years, after which time they must depart and remain abroad for at least one year before seeking to reenter in the same status. 8 U.S.C. § 1184(g)(4); 8 C.F.R. § 214.2(h)(13)(iii)(A).

Although the H–1B visa permits its holder to remain in the United States only temporarily, an H–1B nonimmigrant may obtain a permanent resident visa—better known as a green card—through the employer-sponsored immigration process. Getting a green card takes a long time. An employer must first identify a job for which the H–1B visa holder will be permanently hired and then certify to the Secretary of Labor that (1) "there are not sufficient workers who are able, willing, qualified[,] . . . and available" to fill the position; and (2) that the alien's employment "will not adversely affect the wages and working conditions" of "similarly employed" workers in the United States. 8 U.S.C. § 1182(a)(5)(A)(i). If the Secretary approves the certification, the employer then submits a so-called Form I–140 petition, which must be approved by the Department before the H–1B visa holder can change status. *See id.* § 1154(a)(1)(F), (b); 8 C.F.R. § 204.5(a). But even H–1B visa holders with approved Form I–140 petitions may be

4

unable to adjust status because the Act limits the total number of available employment-based green cards. *See* 8 U.S.C. § 1151(d). The Act also specifies a per-country cap, further limiting the number of green cards available to individuals from the same country. *See id.* § 1152(a)(2). Once a country's cap is reached, applicants from that country must wait until more employment-based green cards become available.

Recognizing the potential for delay in adjustment, Congress amended the Act to permit H–1B visa holders who have begun the employer-based immigration process to remain and work in the United States while awaiting decisions on their applications for lawful permanent residence. Under the amended Act and its implementing regulations, H–1B nonimmigrants with approved Form I–140 petitions who are unable to adjust status because of per-country visa limits may extend their H–1B stay in three-year increments until their adjustment of status applications have been adjudicated. *See* American Competitiveness in the Twenty-first Century Act of 2000, Pub. L. No. 106-313, § 104(c), 114 Stat. 1251, 1253 (codified at 8 U.S.C. § 1184 note); 8 C.F.R. § 214.2(h)(13)(iii)(E). In addition, H–1B visa holders who are the beneficiaries of labor certification applications or Form I–140 petitions are eligible for recurring one-year extensions of H–1B status if 365 days have elapsed since the application or petition was filed. *See* American Competitiveness in the Twenty-first Century Act § 106(a)–(b), 114 Stat. at 1253–54, *as amended by* 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, § 11030A, 116 Stat. 1762, 1836–37 (2002) (codified at 8 U.S.C. § 1184 note); 8 C.F.R. § 214.2(h)(13)(iii)(D).

Against this background, the Department issued a rule permitting H–4 visa holders to obtain work authorization if their H–1B visa-holding spouses have been granted an

5

extension of status under the Act or are the beneficiaries of approved Form I–140 petitions but cannot adjust status due to visa oversubscription. Employment Authorization for Certain H–4 Dependent Spouses, 80 Fed. Reg. 10,284, 10,285 (Feb. 25, 2015) (codified at 8 C.F.R. §§ 214.2, 274a) ("H–4 Rule"). By making H–4 visa holders eligible for lawful employment, the Department sought to "ameliorate certain disincentives that currently lead H–1B nonimmigrants to abandon efforts to remain in the United States while seeking [lawful permanent resident] status, thereby minimizing disruptions to U.S. businesses employing such workers." *Id.* Specifically, the Department explained that H–1B nonimmigrants and their families often face long delays in the process of obtaining permanent residence, and that H–4 visa holders' inability to work during these delays leads to "personal and economic hardships" that worsen over time, "increas[ing] the disincentives for H–1B nonimmigrants to pursue [lawful permanent resident] status and thus increas[ing] the difficulties that U.S. employers have in retaining highly educated and highly skilled nonimmigrant workers." *Id.* at 10,284.

Appellant Save Jobs, an association formed to "address the problems American workers face from foreign labor entering the United States job market through visa programs," Compl. ¶ 8, challenged the rule in the district court, arguing that it exceeded the Department's statutory authority, and that, in adopting it, the Department acted arbitrarily and capriciously. The parties cross-moved for summary judgment on standing and the merits. The district court, finding that Save Jobs failed to demonstrate that the rule would cause its members any injury and thus lacked Article III standing, granted summary judgment in the Department's favor. *See Save Jobs USA v. Department of Homeland Security*, 210 F. Supp. 3d 1, 5, 8–11 (D.D.C. 2016).

6

Save Jobs appealed. Following the early 2017 change of presidential administrations, we held the case in abeyance, initially to allow the incoming administration time to consider the case and later because the Department expected to begin the process of rescinding the rule. In December 2018, we removed the case from abeyance and granted Immigration Voice and two of its members permission to intervene in order to defend the rule. "Our review is de novo." *American Institute of Certified Public Accountants v. IRS*, 804 F.3d 1193, 1196 (D.C. Cir. 2015) (citation omitted).

## II.

"The 'irreducible constitutional minimum of standing consists of three elements': '[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Air Line Pilots Ass'n, International v. Chao*, 889 F.3d 785, 788 (D.C. Cir. 2018) (alteration in original) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). As an association claiming representational standing, Save Jobs has standing to sue if "'(1) at least one of [its] members has standing to sue in her or his own right, (2) the interests [it] seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.'" *American Institute*, 804 F.3d at 1197 (quoting *American Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005)). The Department challenges only the first of these three requirements. Because the district court disposed of this case at summary judgment, Save Jobs "may not rest on 'mere allegations, but must set forth by affidavit or other evidence specific facts' demonstrating standing." *Shays v. Federal Election Commission*, 414 F.3d 76, 84 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

7

(1992)). "For purposes of the standing inquiry, we assume [Save Jobs] would succeed on the merits of [its] claim." *Barker v. Conroy*, 921 F.3d 1118, 1124 (D.C. Cir. 2019).

Save Jobs argues, as it did in the district court, that the rule harms its members in several ways, including by increasing competition for jobs from H–1B visa holders. The doctrine of competitor standing recognizes that "when regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests in that environment suffer legal harm under Article III." *American Institute*, 804 F.3d at 1197 (internal quotation marks and alteration omitted). Relying on this "well-established principle," *Air Line Pilots*, 889 F.3d at 788, our court has repeatedly held that an individual who competes in a labor market has standing to challenge allegedly unlawful government action that is likely to lead to an increased supply of labor—and thus competition—in that market. *See, e.g.*, *Washington Alliance of Technology Workers v. Department of Homeland Security*, 892 F.3d 332, 339–40 (D.C. Cir. 2018) (labor market for science, technology, engineering, and mathematics jobs); *Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014) (labor market for open-range herding jobs). In *Washington Alliance of Technology Workers v. Department of Homeland Security*, for example, we held that a science, technology, engineering, and mathematics workers' union had standing to challenge a Department rule allowing student visa holders to remain in the United States and work after finishing their degrees. 892 F.3d at 339–40, 342. The union alleged that its members had applied to jobs at companies that employed the student visa holders and that those companies had applied for the extension on behalf of the student-employees. *Id.* at 339–40. We found that the union had standing to pursue its challenge, *id.* at 342, explaining that "'the basic requirement'" of a competitor standing claim is "'an actual or imminent

8

increase in competition, which increase we recognize will almost certainly cause an injury in fact,'" *id.* at 339 (quoting *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010)).

Save Jobs contends that, like the regulation challenged in *Washington Alliance*, the rule at issue here will cause its members to face increased competition for jobs. Absent the rule, argues Save Jobs, at least some H–1B visa holders awaiting permanent residence would leave the United States—exiting the labor pool—because their spouses are unable to work. By authorizing H–4 visa holders to seek employment, Save Jobs continues, the rule removes a key obstacle to H–1B visa holders remaining in the United States throughout the immigration process, meaning that more H–1B visa holders will stay and compete with Save Jobs' members than otherwise would have.

The administrative record demonstrates as much. *Cf. Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, 901 F.2d 107, 114–15 (D.C. Cir. 1990) (relying on the "agency's own experience and sound market analysis" and the "public comments" contained in the administrative record as evidence of standing). In promulgating the rule, the Department sought to "incentivize H–1B nonimmigrants and their families to continue to wait and contribute to the United States"—that is, by working—"through an often lengthy waiting period for an immigrant visa to become available." H–4 Rule, 80 Fed. Reg. at 10,296. The Department expected the rule would "benefit U.S. employers by decreasing the labor disruptions that occur when H–1B nonimmigrants abandon the permanent resident process." *Id.* The record contains evidence confirming the Department's expectation: more than sixty commenters wrote that they had planned to move out of the United States, but will instead remain and pursue lawful permanent resident status as a result

9

of the new rule; two dozen reported that they had already left the country due to the prohibition on H–4 visa holder employment; and several warned that they would soon leave because H–4 visa holders cannot work under current (now former) law. *Id.* at 10,288, 10,293. Indeed, the Department expressly "disagree[d]" with one commenter's concern that the record "failed to indicate that potential immigrants have abandoned the immigration process, or have decided against coming to the United States in the first place, because their spouses would not be authorized to work," explaining that it "believes that this rule will fulfill its intended purpose"— namely, "encourag[ing] certain highly skilled H–1B nonimmigrants to remain in the United States." *Id.* at 10,293.

Given that Save Jobs has offered sufficient evidence to show an "actual or imminent increase in competition," *Sherley*, 610 F.3d at 73, all that remains is for it to demonstrate that its members compete with H–1B visa holders in the labor market. It has done so through its members' affidavits. Two members declare that they worked as information technology specialists at Southern California Edison for more than fifteen years until they were fired and replaced by H–1B visa holders. Bradley Aff. ¶¶ 5, 8; Buchanan Aff. ¶¶ 7, 9. A third worked as a system analyst at Southern California Edison for twenty years until she, like the other two, was fired and replaced by an H–1B visa holder. Gutierrez Aff. ¶ 5, 10. All three have been actively looking for new jobs in the technology sector, including by attending job fairs, participating in job placement programs, and submitting job applications. *See* Bradley Aff. ¶ 13; Buchanan Aff. ¶ 14; Gutierrez Aff. ¶¶ 12–13. Although Save Jobs "has offered no evidence that the competitive harm" it claims from the rule "has yet occurred"—indeed, the members lost their jobs, and Save Jobs filed suit, before the rule went into effect—"our precedent imposes no such requirement." *American Institute*, 804 F.3d at 1198. In short, the affidavits

10

establish that Save Jobs' members compete with H–1B workers for technology jobs, and the rulemaking record itself demonstrates that the rule will increase competition for jobs.

The Department insists that any injury to Save Jobs is caused by the H–1B visa program, not by the rule. *See* Appellee's Br. 24–26. We disagree. Save Jobs has shown that the rule will cause more H–1B visa holders to remain in the United States than otherwise would—an effect that is distinct from that of the H–1B visa holders' initial admission to the country.

The Department also contends that Save Jobs has failed to demonstrate that its members are "direct and current competitor[s]," *Mendoza,* 754 F.3d at 1013 (emphasis omitted) (quoting *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004)), of H–1B visa holders. *See* Appellee's Br. 26–28. But the Department overreads our "direct and current competitor" formulation, which simply distinguishes an existing market participant—and a potential—and unduly speculative— participant. Our court first used the term in *New World Radio, Inc. v. FCC*, where a licensee of a Washington, D.C. radio station challenged a Federal Communications Commission order granting a Maryland-based station's license renewal application. 294 F.3d 164, 166, 170 (D.C. Cir. 2002). Explaining that injury to the Washington station could occur "only if" the Maryland station "subsequently seeks *and* secures the relocation of its [Maryland] broadcast license to the Washington, D.C. programming area," we held that the Washington station lacked competitor standing to challenge the license. *Id.* at 171–72; *see also DEK Energy Co. v. FERC*, 248 F.3d 1192, 1194 (D.C. Cir. 2001) (holding that a petitioner who sold gas in the Northern California market lacked standing where it failed to claim that its alleged competitor "ha[d] yet exploited [its] capacity to sell a single molecule of gas in

11

Northern California"); *El Paso Natural Gas Company v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) (rejecting argument that El Paso was a "potential competitor" of suppliers to the Baja California market because it had not satisfied the pre-conditions to the Federal Energy Regulatory Commission's approval of its entry into that market). By contrast, in this case we know that H–1B visa holders have competed with Save Jobs' members in the past, and, as far as we know, nothing prevents them from doing so in the future.

Making a related point, the Department argues that because H–1B visa holders "by definition are already employed," Save Jobs must provide "more evidence that [H–1B visa holders] are seeking new jobs in the same market as Save Jobs' members." Appellee's Br. 26–27 (emphasis omitted). Again, we disagree. The supply side of a labor market is made up of those individuals who are employed *and* those actively looking for work. Indeed, in *Washington Alliance*, we never questioned that technology job seekers competed in the same labor market as student visa holders employed at technology firms. *See* 892 F.3d at 339–40.

Next, the Department claims that any H–1B visa holders affected by the rule "are by definition . . . staying to apply for permanent residence," making them "part of the *domestic* labor pool of U.S. workers—not alien competitors." Appellee's Br. 27 (internal quotation marks omitted). We cannot see how this defeats Save Jobs' claim of increased competition, and the Department never tells us.

At oral argument, Department counsel insisted that no H–1B visa holder who will benefit from the rule will compete with any Save Jobs members because eligibility for the rule depends on the H–1B visa holder first having been offered a job for which the Department of Labor has certified "no U.S. worker

12

is available." Oral Arg. Tr. 21:17–18. In effect, counsel invites us to distinguish between H–1B visa holders generally, with whom Save Jobs' members are quite clearly in competition, and H–1B visa holders who have begun the process of applying for lawful permanent residence, who the Department contends can only take jobs for which there is no American competition. *See id.* at 28:11–19 ("They have not pled that they are seeking employment at companies for which H–1B workers who would receive a benefit from the H–4 Rule are currently employed, but even if they did, . . . [that] would require . . . the prospect that . . . the H–1B visa holder was in a job for which no U.S. worker was available, but instead they were available.").

The Department neither raised this argument before the district court nor briefed it on appeal. "Generally, arguments raised for the first time at oral argument are forfeited." *United States ex rel. Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015). Given the Department's insistence that the certification procedure "goes to our jurisdiction," however, we shall consider it—"though we are disappointed in the [Department] for raising this issue so late that [Save Jobs] had no adequate opportunity to respond." *Shays v. Federal Election Commission*, 528 F.3d 914, 923 (D.C. Cir. 2008).

The argument lacks merit in any event. The rule, as well as the Department's own briefing here and before the district court, explains that for H–1B visa holders' spouses to qualify for employment authorization, the H–1B visa holders need only be the beneficiaries of *pending* labor certification applications. *See* Appellee's Br. 5–8; Def.'s Mem. in Supp. of its Mot. for Summ. J. 3–4. While the application remains pending, H–1B visa holders compete in the labor market against Save Jobs' members. Even more, after the labor certification is issued, in certain circumstances H–1B visa holders may change jobs without obtaining new certifications.

13

*See* 8 U.S.C. § 1182(a)(5)(A)(iv) (explaining that a labor certification for a nonimmigrant "covered by section 1154(j)"—which pertains to nonimmigrants whose permanent residence applications remain pending for 180 days or more— "shall remain valid with respect to a new job . . . if the new job is in the same or a similar occupational classification as the job for which the certification was issued"). The Department's last-second effort therefore does nothing to change our understanding of the case.

One additional matter remains: Save Jobs challenges the standing of Immigration Voice, Anujkumar Dhamija, and Sudarshana Sengupta to intervene in this appeal. But a motions panel has already ruled that the intervenors have standing, and we are bound by that decision. *See Petties v. District of Columbia*, 227 F.3d 469, 472 (D.C. Cir. 2000) ("Under this court's practice, a decision of the motions panel is the law of the case; a later panel considering the merits is bound by that law.").

14

## III.

Given that the merits here involve complex questions about the scope of the Department's authority, which the Department did not brief on appeal, and recognizing the substantial possibility this case will be mooted by the Department's promised rescission of the rule, we think it best to remand to give the district court an opportunity to thoroughly assess and finally determine the merits in the first instance. *Cf. Save Jobs*, 210 F. Supp. 3d at 12–13 ("briefly discuss[ing] the merits of Plaintiff's APA claim" but "mak[ing] no final determination"). Accordingly, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

*So ordered.*